**FOOD MACHINERY & CHEMICAL CORPORATION, a Corporation, operated as Westvaco Mineral Products Division, and J. R. Simplot Company, a corporation, Appellants,**

v.

**W. S. MEADER and May Meader, husband and wife, Appellees.**

Nos. 17058, 17059.

United States Court of Appeals Ninth Circuit.

Aug. 25, 1961.

Rehearing Denied Sept. 26, 1961.

B. W. Davis, Pocatello, Idaho, for Food Machinery & Chemical Corp.

Hawley & Hawley and Lloyd E. Haight, Boise, Idaho, for J. R. Simplot Co.

Louis F. Racine, Jr., and Hugh C. Maguire, Jr., Pocatello, Idaho, for appellees.

Before ORR, HAMLEY and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

On January 31, 1957, W. S. Meader and May Meader, husband and wife, filed complaints in the United States District Court for the District of Idaho, Eastern Division, against Food Machinery & Chemical Corporation and J. R. Simplot Company.[1] The Meaders sought to recover for damages allegedly resulting from the operation of the defendants' industrial plants which were located near the plaintiffs' trout hatchery. The district court's jurisdiction was based on diversity of citizenship, 28 U.S.C.A. § 1332. After a trial before a jury judgment for damages was entered against the defendants. Timely notice of appeal was filed, and this court has jurisdiction of the appeal under the provisions of 28 U.S.C.A. §§ 1291 and 1294.

Warren S. Meader and May Meader, appellees herein, were the owners of a "trout farm" and hatchery located in Power County, Idaho, and the appellants are the owners and operators of industrial plants located about two miles from the Meaders' trout farm.[2] It is undisputed that quantities of fluorine compounds were given off in the manufacturing processes of the appellants; and the Meaders claim that these compounds, both solid and gaseous, contaminated their property and the ponds and streams thereon, killed their fish, and damaged trout eggs that they marketed, making the property generally unsuitable for use in the operation of a hatchery. The evidence was presented to a jury which as-

sessed damages against Simplot in the sum of $4,246.41 and against Food Machinery in the sum of $57,295.80. It is from the judgment entered on this verdict that the defendants have brought this appeal. The three main contentions which are pressed before this court are as follows:

I. The evidence is insufficient to sustain the jury verdict.

II. The appellees concealed evidence at the time of trial.

III. The court erred in admitting certain documentary evidence.

### I.

The appellants' primary contention is that the evidence is insufficient to support the finding of the jury.

The appellees, commencing some time in 1915 and for a long period thereafter, operated a fish hatchery near Pocatello, Idaho, raising trout for sale commercially; developing brood stock for the taking of trout eggs; and selling trout eggs in a market that had been developed over the years. Simplot commenced operation of its plant in 1944, and Food Machinery commenced operation of its plant in 1949. Each of the plants emitted fluorides in gaseous and particulate form and have continued to do so in greater or lesser amounts. The greatest emission occurred in 1951 through 1954, and the following figures show the discharge in pounds per day of effluent in the way of fluoride:

| Food Machinery & Chemical Corporation | | J. R. Simplot Company | |
|---|---|---|---|
| 1949 | 1700 | 1949 | Unknown |
| 1950 | 1700 | 1950 | Unknown |
| 1951 | 3300 | 1951 | Unknown |
| 1952 | 3300 | 1952 | Unknown |
| 1953 | 6500 | 1953 | 484 |
| 1954 | 3100 | 1954 | 110 |
| 1955 | 600 | 1955 | 190 |
| 1956 | 600 | 1956 | 190 |

---

1. Hereinafter Food Machinery and Simplot, respectively.

2. Food Machinery & Chemical Corporation's plant produces phosphorus, and Simplot's produces acids and fertilizers.

The amount of material that was emitted from the plants is not in issue on this appeal. The figures given above were taken from studies done by employees of the appellants and are agreed to as being correct.

Fluorine and fluorides are toxic, and it is recognized that a sufficient concentration can be harmful and may eventually result in death. Pronounced losses of fish and difficulty with fish eggs did occur at the Meader property during the years involved in this law suit, and the extent of the losses that the Meaders experienced is not an issue on this appeal.[3] The jury found that the losses resulted from the fluorides emitted by the appellants. After a review of all the evidence we have concluded that it does support the result reached by the jury and we have outlined the relevant evidence in order to show how we arrived at this decision.

The testimony of Warren Meader, one of the appellants, and that of his son provided evidence from which the jury could find the following. The hatchery was started by Warren Meader in about 1915, and he operated it until 1946 when he turned the operation over to Phillip, his son. Phillip operated the hatchery until 1954, when his father retook control of the operations and ran the business until the property was sold in June of 1956. The main business at the hatchery was the production of trout eggs which were sold to hatcheries all over the United States and even shipped to Japan on three occasions. The average number of eggs taken per year was 20 million; Warren Meader never took more than 22 million, but his son did take about 30 million in one year. The temperature of the water on the Meader property is particularly suited to the raising of trout eggs, for when the water comes from the springs, it is about 52 degrees, a low temperature beneficial in the production of healthy eggs. After Warren Meader left the property in 1946 everything went as usual until the 1949–50 egg season when some trouble was noticed. A large crop was taken in the 1950–51 season and all of the eggs were sold, but the eggs were unproductive. There was little or no egg business after 1952. The customers that it had taken thirty years to gather deserted the Meaders when it turned out that the eggs did not hatch properly.[4] Phillip worked hard to keep the fish pools clean; he had a crew working on the tanks; and he checked the oxygen level of the water regularly. He experimented with fish and fish eggs from other places in an attempt to determine the cause of the

3. The following analysis of fish losses for the years 1948 through 1954 is taken from Plaintiffs' Exhibit No. 22.

| | Lbs. Market Fish | Lbs. Spawners | Lbs. 4" to 5" long | Count Fingerlings | Eggs |
|---|---|---|---|---|---|
| 1948 | No records | | | | |
| 1949 | No records | | | | |
| 1950 | No records | | | | |
| 1951 | 34,000 | 23,000 | | | |
| 1952 | 49,662 | 12,300 | 3,000 | 110,000 | 4,000,000 |
| 1953 | 18,064 | | | 1,188,500 | 2,500,000 |
| 1954 | | | | (est) 500,000 | (est) 4,500,000 |

4. The following figures are taken from Plaintiffs' Exhibit No. 22 and show the number of fish sold by the Meaders during the years in question.

| | | |
|---|---|---|
| 1949 | 16,361,000 | |
| 1950 | 20,814,000 | |
| 1951 | 20,433,000 | |
| 1952 | 4,200,000 | (took 30,000,000 eggs) |
| 1953 | none | (took 20,000,000 eggs) |
| 1954 | none | (took 13,000,000 eggs) |

trouble. He testified that he ran the hatchery in the same way that his father had run it successfully for years and that though there was no evidence of any fish diseases, the loss of adult fish was very great at times, the eggs were worthless, and the customers were lost. Phillip testified that he saw and smelled the smoke from the defendants' plants hanging heavy around his property. It was heaviest in the evening and in the early morning; at times being so thick that he couldn't see from one building to another, some 200 to 300 feet. When Warren Meader returned to take over the operations in 1954, he did so because he felt that his son was responsible for the losses that had occurred in the preceding years. It was obvious that something was wrong, and he wanted to find out what it was. When Warren Meader returned he found everything in good order, for the operations were being conducted as he had conducted them in the past. He thought at first that the death of some of the fish might have been due to the hot weather at that time, and he decided to see if it would help if he raised the level of the water in the ponds. There was milkweed and tule along the bank. After he raised the water level, the fish would swim in among the vegetation, but they would not swim out. He then lowered the water level and pulled out the vegetation. Then the fish stopped dying. After the first rain of the season the water ran off the willows that hung over the fish pond and "there was a string of dead fish right down through that pond three and a half to four feet wide." About one-tenth of the total number of fish was killed. Young fish died in the hatchery where fish had never died before; and during the week after the rains, the Meaders were hauling away about a ton of dead fish a day. Also, of the fish that did hatch many were cripples; that is, their spinal cords were crooked. Phillip, who had worked at the hatchery since he was a boy, testified that the dead fish showed no evidence of having any disease and that there was no way that he could explain the events

that had occurred except by looking to the operations at the defendants' plants.

Austin J. Bennett, who worked for the Meaders during the period of the trouble that caused this law suit, lived in the valley near the fish ponds. He testified that he was familiar with the odor of the smoke from the Simplot plant and that he recognized that odor down by the Meader hatchery. He said that at times the odor was so bad that "you could hardly get your breath. It was nauseating and would burn your nose and throat." He also testified that from where he lived he could see the smoke coming from both plants; it was heaviest in the mornings and the evenings.

Theodore Kass, a chemical engineer for defendant Food Machinery & Chemical Corporation who was in the processing division doing studies on plant improvement from 1949 to 1952, testified as to the operations of that defendant. Phosphate shale is brought to the plant where it is processed in a rotary kiln where the temperature is often as high as 1100 degrees Centigrade. Water, organic matter, and a fluorine compound called fluoropatite are given off as a result of this heating process. Gaseous fluorides are also emitted from slag dumped as waste, but later testimony indicated that the amount of fluoride given off by the slag is negligible compared to that which comes out of the chimneys. Part of Kass' work was the conducting of studies of the effects of high concentrations of fluorides, but his main interest was in the effect of fluorides on cattle, and he was not concerned with fish. However, samples were taken to obtain the concentration of fluoride in the water at the Meader hatchery which showed a range of from .5 to 4.7 parts per million.

Kass' testimony indicates that Food Machinery recognized that there was a fluoride problem, but that initially no thought was given to the possible effects of fluorides on fish. Kass talked of the steps that were taken after 1949 in order to cut down the amount of fluoride that was emitted from the smoke stacks.

In this regard the figures showing the amounts of fluoride emitted during the years in question are worthy of note, for they show a definite drop after corrective measures were taken.

Doctor Lawrence Gale, appellees' expert, is a Doctor of Pharmacology. His main work has been in the field of toxicology, the study of the reaction of living organisms to toxic substances or drugs. He testified in substance that in his opinion when over 4.5 parts per million of fluorine are in the environment of an organism, the food, water, etc., 35–60% of the fluorine is retained within the body of the animal. He stated that when there is over three parts per million in the environment "you are in the danger zone"; and the fish would be affected; and the ovum or eggs of the female fish would be affected. He further stated that fluorine infection would interfere with the normal growth and development of the organism, again specifically stating that over three parts per million would have some effect. He indicated that the effect would be more pronounced on young organisms which did not have a well developed bone structure, for excess fluorides are stored in the bone, and when the bone structure is not well developed there is no place for storage. Dr. Gale admitted that he was not an expert on fish, and that he had never done any experiments on trout. His work was done on living cells rather than a complete organism. He was not asked whether in his opinion the fluorides killed the Meader fish. He had no first hand knowledge of the situation, and his only use was as an expert on the toxicity of fluorine. However, we feel that from his testimony the jury could reasonably conclude that a concentration of over three parts per million of fluoride in water could be harmful to adult fish and potentially more harmful to immature fish and to fish eggs.

On this appeal the appellants contend that the testimony of Dr. Henry C. Wohlers and of Dr. Edward Wood dictates a verdict for the defendants. In substance Dr. Wohlers testified that the fluorine concentrations were not high enough to cause the damage suffered by the Meader fish. However, it is worthy of note that he did not begin to run any tests until 1954, and that the tests on the leaves on the willows were not run in the "unwashed state." It would seem that it was not unreasonable for the jury to fail to give weight to these studies when it was shown that the leaves were washed before they were tested for fluoride concentrations. Washing would mean that the only fluorides that would show up in the measurements were those that had been absorbed by the leaf. Any fluorides that might have been resting on the leaves would have been washed away before the tests were made. The Meaders testified that they lost a great portion of their fish after the rainstorms. The implication is that fluorides had settled on the willow leaves and other vegetation and had been washed off into the ponds by the rains. Warren Meader testified that when the fish went in among the grasses that had been newly submerged by the raising of the level of the pond, they died. The implication is that the fish died not from something that was in the vegetation, but rather from something that was "on" the vegetation. The testimony of Dr. Wohlers establishes that he washed the leaves before he tested them. Therefore, he must have washed off anything that was *on the leaves*. It might be said that this only tends to show that the plaintiff has not established that there was anything "on" the leaves, and the burden being on him to prove his case, he must lose. However, it must be remembered that the effect of fluorides on fish had been unknown until about the time of this case, in fact it appears that the only substantial knowledge that anyone had about fluorides seems to have been developed simultaneously with this case, and perhaps in part because of the events at the Meader hatchery. Phillip Meader did not know what was wrong with his fish. As indicated by the testimony both he and his father, at least up until 1954, looked to causes other than fluoride poi-

soning as the reason for the trouble. Warren Meader thought that the trouble was due to mismanagement by his son, until he returned in 1954 and discovered that everything had been run properly. These people did not know what was wrong and they did not know what to do. By the time they pinned the problem down to fluoride, circumstances had changed, for both companies had installed devices that were designed to cut down the amount of fluoride emitted into the atmosphere. Another weakness of the tests run by the appellants is that no tests for the fluoride concentrations in the water at the Meader place were made after the rains, the times when the greatest loss of living fish occurred.

No one ever specifically analyzed one of the dead fish in order to determine whether it died of fluorosis,—apparently because no one ever was around to do so at the time that there were dead fish. The best that we have are some analyses that show higher concentrations of fluorides in the Meader fish than in other fish that were analyzed, and the concentrations were definitely higher than the three parts per million referred to by Dr. Gale as the danger area.[5]

Dr. Wood never analyzed any of the Meader fish. He testified that in his opinion the fish losses were due to some cause other than fluoride poisoning, such as a bacterial infection or ammonia poisoning. Much of this testimony seemed to rest on his belief that the Meader hatchery was mismanaged by Phillip before Warren Meader retook the control; however, on cross-examination he admitted that his information as to mismanagement was based on hearsay. Against this testimony is the testimony of Warren Meader and his son that the hatchery was managed during the years of trouble the same way that it had been managed during the good years. Dr. Wood also disagreed with Dr. Gale on many points, such as that the fish could be harmed by as little as 4.5 parts per million in the water. This is a conflict of testimony that it is the jury's duty to resolve.

A defendant is not liable to a plaintiff for injury suffered by the plaintiff unless there is some reasonable connection between the act of the defendant and the injury. The defendant's act may be both potentially harmful and illegal, but the plaintiff cannot recover unless the injury was the result of the act.

"This connection is usually dealt with by the courts in terms of what is called 'proximate cause,' or 'legal cause.' There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion."[6]

The appellants have cited a number of cases in support of the proposition

---

5. The following material is taken from Plaintiffs' Exhibit No. 18 entitled "Fluorine Analysis of Rainbow Trout Tissues and Bone."

| Source | Description of Fish | Fluorine, ppm (Dry Fat-Free Basis) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Bone | Skin | Muscle | Viscera | Eggs | Whole Fish |
| Crystal Springs | Fingerling | | | | | | 40 |
| " | 6–9", 2–3 yr. | | | | | | 73 |
| " | 2 lb. | 885 | 229 | 5 | 2 | 1 | |
| Meader | Fingerling | | | | | | 113 |
| " | 6", 1 yr. | | | | | | 69 |
| " | 2 year | 1125 | 114 | 6 | 22 | | |
| " | 6–9" | 900 | 202 | 8 | 77 | | |
| " | 2 year | 1225 | 303 | 8 | 30 | | |
| " | Spawning | 725 | 127 | 3 | 19 | 4 | |

6. Prosser, Law of Torts (2d ed. 1955) 218.

that the plaintiffs should not be allowed to recover on the strength of the evidence now before this court. The rationale is that there is not sufficient evidence from which the jury could find that it is more likely than not that the Meaders' fish and eggs were injured because of the conduct of the appellants in running their respective chemical plants.

"It is the jury's function, not the court's, to say whether plaintiff's version of the case is sustained by the greater weight of the evidence. A case therefore in which the evidence most favorable to plaintiff (including the opinion of qualified experts) affords the basis for an inference of cause is not defeated as a matter of law by defendant's evidence of a different version of facts or a different theory of cause of fact." [7]

Since the jurisdiction of the federal court in this case is based on diversity of citizenship, the law of Idaho is controlling on substantive issues. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. There is, however, no well developed system of Idaho law on this point. As Messrs. Harper and James point out in their text, this area of the law has been handled case by case, and in keeping with this theory is the fact that neither the plaintiffs nor the defendants have been able to show us any Idaho law that indicates any general Idaho principles that control. In view of this fact we have been forced to look at many cases from many jurisdictions to try to come to what we feel is the best solution to the problem.

The Massachusetts case of Comeau v. Beck, 1946, 319 Mass. 17, 64 N.E.2d 436, presented a situation which is similar from a theoretical point of view to the case now before this court. The plaintiff's car was struck by a vehicle operated by the defendant. The plaintiff testified (1) that she was three months pregnant at the time of the collision; (2)

that she struck her abdomen on the automobile steering wheel at the time of the collision and suffered great pain therefrom; and (3) that she had a miscarriage nine days later. She offered no expert testimony. The defendant's expert, a physician who had examined the plaintiff months after the accident, testified that he doubted that the plaintiff had had a miscarriage, and stated that even if she did it was not a result of the accident. On cross-examination he stated that a miscarriage could result from a blow on the abdomen. A jury verdict for the plaintiff was upheld on appeal. The court said:

"We think, although with some hesitation, that the plaintiff's testimony with respect to the accident and the condition of her health afterwards, in conjunction with the testimony of defendant's doctor to the effect that a miscarriage might be · produced by 'some injury, (or by) the striking of the abdomen', was enough to support a finding that the plaintiff's miscarriage was causally related to the accident." [8]

Here, as in the case now before this court, there was expert testimony to the effect that the injury was not caused by the wrong of the defendant. There was no direct expert testimony to the contrary, but rather only a statement to the effect that such an injury *might* result from a blow in the abdomen. The evidence on which the court relied was circumstantial. The plaintiff showed that she was healthy before the injury but ill thereafter. In the same way the Meaders showed that the fish were healthy before the fluorides were dispersed upon the property but unhealthy thereafter.

In general it would seem that the court is faced with a situation where it cannot say that reasonable men could not agree that it is more likely than not that the Meader problems were caused by fluorine poisoning. We feel that the cases cited by the appellant are distinguish-

---

7. 2 Harper and James, Law of Torts 1119.

8. 64 N.E.2d at page 437.

able. In Magnolia Petroleum Co. v. Davis, 1944, 193 Okl. 699, 146 P.2d 597, there was nothing that would indicate that salt was in the water in sufficient quantities to kill the plaintiff's fish. In Prest-O-Lite Co., Inc. v. Howery, 1934, 169 Okl. 408, 37 P.2d 303, it was not shown that there were poisonous substances in the water. In Christensen v. Northern Power Co. of Wis., 1946, 222 Minn. 474, 25 N.W.2d 659, there was no evidence that would indicate that electricity and dynamite in water will kill fish, and the court refused to take judicial notice of the fact that they would. However, in the case now before this court Dr. Gale indicated that over 4.5 parts per million of fluorine would be harmful to fish, and other evidence establishes that that quantity was present on at least one occasion.

It is not the function of the appellate court to make a re-evaluation of the evidence. On the basis of the evidence that is now before us, we cannot say that the jury was wrong in determining that the fluorides killed the fish. We feel that under the circumstances there was substantial evidence upon the record as a whole to support the decision of the jury.

## II.

■■ The appellees had studies made by experts with the Utah State College, but the results were not introduced into evidence, and the experts were not called as witnesses. It is not clear from the appellants' brief just what they expect this court to do, but we will do nothing, for the law does not require that a party introduce all of the evidence that is available to him. At the conclusion of the trial appellants made no request for an instruction by the trial judge to the effect that the failure to call witnesses creates a presumption that the testimony that they would give will be adverse, and no objection was made to the instructions actually given by the trial court. Coun-

sel may comment to the jury on the failure to call a witness or the judge may instruct on the presumption, but this court will not reverse the decision of the jury on the strength of a presumption that is designed to aid the trier of fact.[9] Nor is there anything in the record that the appellees were concealing evidence in bad faith. The record shows that the appellants knew the studies had been made and where the people who had done the work could be reached, yet they made no attempt to call them to the stand. We cannot see that the appellants were prejudiced in any way by these events.

## III.

■ The appellants also object to the introduction into evidence of exhibits 1 through 9, reports made by employees of Food Machinery on the fluoride problem existing in the area surrounding the plant. The objection is that the exhibits contained "a tremendous amount of immaterial, irrelevant and incompetent matter, opinions and conclusions of the maker of said reports, extremely prejudicial to the Appellants." However, counsel does not attempt to set forth any details of "prejudicial" matter or "irrelevant and incompetent matter." It appears that these reports were made in the ordinary course of business by Food Machinery employees and covered the knowledge of Food Machinery as to the fluoride problem. We see no error in the admission of the evidence nor in the rulings of the district court refusing to admit appellants' exhibits 20 and 35.

We have examined all the contentions of appellants and have found no merit in them. The action appears to have been fully and fairly tried, and we see no reason for the reversal of the jury verdict.

The judgment of the district court is affirmed.

---

9. See, McCormick, Evidence 533.